## UNITED STATES BREWERS ASSOCIATION, et al.

v.

**John T. HEALY, et al.**

**No. Civ. H–84–816 (PCD).**

United States District Court, D. Connecticut.

Sept. 11, 1987.

J. Charles Mokriski, Day, Berry & Howard, Hartford, Conn., Jeffrey Glekel, Skadden, Arps, Slate, Meagher & Flom, New York City, William H. Allen, Covington & Burling, Gary Nateman, U.S. Brewers Ass'n, Inc., Washington, D.C., for plaintiffs.

Richard M. Sheridan, Robert F. Vacchelli, Asst. Attys. Gen., Newington, Conn., for defendant Commissioners and Secretary.

Alfred F. Wechsler, William A. Wechsler, Kevin D. O'Leary, Hartford, Conn., for Wine and Spirits Wholesalers.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DORSEY, District Judge.

Plaintiffs are the United States Brewers Association ("USBA")—an industry association of thirty-nine domestic brewers and twenty-three importers of beer—and those of its member companies who sell beer in Connecticut and in the bordering states of Massachusetts, New York and Rhode Island.

Defendants are the Commissioners and Secretary of the Connecticut Department of Liquor Control.

Intervening defendant Wine & Spirits Wholesalers of Connecticut is a trade association of seven companies which sell alcoholic beverages, including beer, at wholesale within Connecticut.

Plaintiffs' complaint seeks a declaratory judgment that the beer price affirmation provisions of Conn.Pub.Act 84–332,[1] 84–

1. Conn.Pub.Act 84–332 provides, in relevant part:

Each manufacturer, wholesaler and out-of-state shipper permittee shall post with the department on a monthly basis, the bottle,

432[2] and § 30–63a(b) of the Connecticut Liquor Control Act[3] violate the commerce clause[4] and the supremacy clause[5] of the United States Constitution. Plaintiffs also seek a permanent injunction to restrain defendants from enforcing these statutes.

Currently pending are cross-motions for summary judgment, which have been exhaustively and intelligently briefed and rebriefed by the USBA, the intervening defendants and the State Attorney General's Office. For the reasons that follow, USBA's motion is denied, and the motion of defendants and intervening defendants is granted.

## I. Background

### A. The Beer Industry[6]

The beer industry in Connecticut is divided into three marketing levels: (1) brewers and importers; (2) wholesalers; and (3) retailers. Each market participant must hold a valid Connecticut license to sell, in Connecticut, alcoholic beverages to the tier below and, ultimately, to consumers.

The brewers and importers market national brands such as Budweiser or Miller High Life, and regional or local brands such as Genesee Cream Ale or Piels. There are no breweries in Connecticut. All beer—national or regional—is shipped into

---

can and case price, and for beer, the price per keg or barrel or fractional unit thereof, of any brand of goods offered for sale in Connecticut, which price when so posted shall be the controlling price for such manufacturer, wholesaler and out-of-state shipper permittee for the month following such posting.
. . . .
. . . .
At the time of posting of the bottle, can, keg or barrel and case price ..., every holder of a manufacturer or out-of-state shipper's permit, or the authorized representative of a manufacturer, shall file with the department of liquor control a written affirmation under oath by the manufacturer or out-of-state shipper of each brand of beer posted certifying that at the time of posting the bottle, can or case price, or price per keg, barrel or fractional unit thereof, to the wholesaler permittees is no higher than the lowest price at which each such item of beer is sold, offered for sale, shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state....
. . . .
This section shall not prohibit a manufacturer or out-of-state shipper permittee or the authorized representative of a manufacturer from changing prices to any wholesaler in any other state ... at any time during the calendar month covered by such posting....
In determining the lowest price for which any item of beer is or was sold ... at the time of posting, appropriate reductions will be made for all discounts, rebates, free goods, allowances and other inducements of any kind whatsoever, including depletion and floor-stock allowances, offered or given to any such wholesaler; provided that differentials in price which make only due allowance for the actual costs of delivery are permissible.... A manufacturer or out-of-state shipper of beer shall offer to Connecticut wholesalers all of the sizes, approved by the department of li-

quor control, of his brand which he offers to any wholesaler in any state bordering this state. . . .

2. Conn.Pub.Act 84–432 provides, in part: "In determining the lowest price for which any item of beer is or was sold, offered for sale, shipped, transported or delivered during such posted period by any manufacturer or out-of-state shipper to a wholesaler in any state bordering this state, [only differentials in price attributable to differences in state taxes and to delivery costs are permissible]."

3. Section 30–63a(b), Conn.Gen.Stat., provides, in part, that:
No holder of any manufacturer or out-of-state shipper's permit shall ship, transport or deliver within this state, or sell or offer for sale to a wholesaler permittee any brand of beer ... at a bottle, can or case price, or price per keg, barrel or fractional unit thereof, higher than the lowest price at which such item is then being sold or offered for sale or shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state.

4. "Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. Const. art. I, § 8, cl. 3.

5. "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

6. This description is based on submissions of the parties as well as the findings of Blumenfeld, J., in *United States Brewers Ass'n v. Healy*, 532 F.Supp. 1312 (D.Conn.), *rev'd*, 692 F.2d 275 (1982), *aff'd*, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983).

Connecticut by brewers and importers designated as "out-of-state shippers" under Connecticut law.

Plaintiffs contend that prices charged and package configurations offered to wholesalers in Connecticut and the bordering states vary in the several markets within the four state area. (Market areas do not always coincide with state borders.) In certain markets, regional brewers or importers price their beers to allow sales to consumers at the lowest prices possible in those markets. Other brewers or importers competing in these areas must consider this competitive pricing in pricing their own product. It is agreed by all parties that the New York City market is the most competitive and prices there are the lowest in the four-state region. Other factors which have an impact on pricing and marketing decisions, such as consumer tastes, packaging, costs and freight, vary from area to area even within these states. Thus, according to plaintiffs, a variable pricing and marketing structure has emerged in Connecticut and the bordering states which results in substantial interstate competition in retail beer sales.

In Connecticut, typically more than one wholesaler sells an out-of-state shipper's products. Each wholesaler generally handles products of more than one out-of-state shipper but is restricted by law from selling to retailers outside its assigned geographical territory.

The primary retail outlets for off-premise consumption of beer in Connecticut are package and grocery stores. Retailers, particularly near the borders, face substantial competition from retail beer outlets in the bordering states. Although prices charged to Connecticut wholesalers are neither the highest nor the lowest in the four-state region, retail prices historically have been higher in Connecticut. Accordingly, many Connecticut residents have purchased beer at lower retail prices in New York, Massachusetts or Rhode Island.

### B. *Price Affirmation*

In 1981, Connecticut amended its Liquor Control Act by adding beer price affirma-

tion provisions. The Act required out-of-state shippers to post, each month, the bottle, can and case price for the brands of beer each sells in Connecticut. The amendment required shippers to execute written affirmations under oath certifying that the posted prices "will be no higher than the lowest price at which each such item of beer is *or will be* sold ... to any wholesaler in any state bordering this state, at any time during the calendar month covered by such posting." Liquor Control Act § 30–63b(b), as originally amended by Section 12 of Conn.Pub.Act 81–294 (emphasis added). No brewer or importer could sell beer to a wholesaler in Connecticut at a price higher than the lowest price then charged any wholesaler in any state bordering Connecticut. Liquor Control Act § 30–63a(b), as originally amended by Section 11 of Conn. Pub.Act 81–294. Once posted, the affirmed price became the controlling or fixed price for the ensuing month for the out-of-state shipper's products in Connecticut. Rebates, discounts, special promotions and other inducements which lowered the price of beer in the border states required the price to be lowered in Connecticut, but differentials in price were permitted for different state taxes and delivery costs. No allowance was made for different package configurations (e.g., a case of six-packs versus a case of loose cans or bottles), yet for any brand a brewer offered for sale in Connecticut, it had to offer Connecticut wholesalers all the units of that brand offered to wholesalers in the border states.

Thus brewers and importers in the four-state area had the following alternatives: (1) lower their Connecticut prices to equal the lowest price in any bordering state; (2) raise prices in border states to the Connecticut levels; (3) withdraw from Connecticut the brands of beer sold at lower prices in the border states; or (4) withdraw from the border states the brands of beer sold at lower prices than the Connecticut price.

The 1981 amendments were upheld by the district court, *United States Brewers Ass'n v. Healy*, 532 F.Supp. 1312 (D.Conn. 1982), but declared unconstitutional by the

Second Circuit, *United States Brewers Ass'n v. Healy,* 692 F.2d 275 (2d Cir.1982) (hereinafter *"Healy I"*), *aff'd without opinion,* 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983). The Court of Appeals held that the price affirmation provisions impermissibly burdened interstate commerce and that the twenty-first amendment[7] did not authorize Connecticut to set minimum prices of beer in any other state.

Thereafter, Connecticut enacted the different version of beer price affirmation set out in notes 1–2, *supra.* Instead of requiring out-of-state brewers and importers to certify that their prices "will be" no lower in any of the border states during the month following the posting of prices in Connecticut, the new statute requires only that at the moment of affirmation the prices charged to Connecticut wholesalers *are* no higher than the lowest price then being charged in any border state.

### C. *The Present Controversy*

In their complaint, plaintiffs originally alleged that:

the interaction of the posting and affirmation provisions of Pub.Act 84–332 with Section 30–63a(b) of the Liquor Control Act not only limits the price at which out-of-state shippers may sell to Connecticut wholesalers, but also sets the lowest price which an *out-of-state shipper* may charge anywhere in the Border States during the succeeding month. Thus, as under the original price affirmation scheme, an out-of-state shipper is not free to lower any Border State price be-

low the previously affirmed Connecticut price.

Complaint at 14. They argue that the new provisions violate the supremacy clause by requiring out-of-state shippers to establish and maintain minimum prices for each item of beer in the four-state area and by precluding them from dealing with any of their customers except on the same or more favorable terms as they dealt with other of their customers, viz, Connecticut was forcing them to engage in conduct prohibited by federal antitrust laws.

Defendants conceded that, "standing alone," Conn.Gen.Stat. § 30–63a(b), which was not amended following *Healy I,* appeared to prohibit the lowering of out-of-state prices of products sold in Connecticut during the entire month following the posting of Connecticut prices for that product. Defendants' Brief on Motion for Summary Judgment at 8. However, defendants contend that such an interpretation flies in the face of Conn.Pub.Act 84–332 which explicitly recognizes the right of out-of-state shippers to raise or lower their prices outside Connecticut at any time during the month following posting. In further support of their position, defendants filed a declaration and ruling by the Connecticut Liquor Control Commission.[8] The ruling made clear that, whatever the import of § 30–63a(b), out-of-state shippers need only affirm that at the time of posting in Connecticut (and *only* at the time of posting), their prices to Connecticut wholesalers are no higher than in the border states.[9]

---

**7.** "The transportation or importation into any State ... for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2.

**8.** Conn.Gen.Stat. § 4–176 states that the Liquor Control Commission "may, in its discretion, issue declaratory rulings as to the applicability of any statutory provision or of any regulation or order of the agency...."

**9.** The Commission stated:
[W]e must interpret [§ 30–63a(b) ] in light of the obvious intention of the Connecticut General Assembly.... Accordingly, we determine and declare that C.G.S. § 30–63a(b)

mandates only that the brewer in a sale to a Connecticut wholesaler not exceed its previously posted price in Connecticut, but that a sale at a price lower in a border state, during the calendar month covered by such posting, does not contravene this section.... To the extent ... that C.G.S. § 30–63a(b) is inconsistent with [Conn.Pub.Act 84–332], it must be considered impliedly repealed since the latest expression of the legislature controls. Thus under the new affirmation scheme an out-of-state shipper is free to lower any border state price below the previously affirmed Connecticut price.
Affidavit of the Liquor Commission at 3–4.

After the Commission's ruling,[10] plaintiffs withdrew their claim based on the supremacy clause and conceded that the affirmation . laws, as interpreted by the Commission, would not directly control prices in the border states. Plaintiffs' Memorandum in Support of Their Cross-Motion for Partial Summary Judgment at 18. However, plaintiffs persist in their claim that the affirmation provisions on their face and as applied,

> are purely protectionist legislation designed to protect in-state wholesalers and retailers at the expense of out-of-state brewers, wholesalers and retailers. The purpose and effect of the new law is precisely the same as the old law—discouraging purchases of beer by Connecticut residents in the Border States by requiring the brewers to offer their products to Connecticut wholesalers at prices which are artificially lower than competition would warrant, or conversely, to artificially raise their prices to Border State wholesalers.

*Id.* at 19.

Plaintiffs' cross-motion for summary judgment is, thus, bottomed on the unconstitutionality of the amended price affirmation law. Conversely, defendants' motion is based on the claim that the legislation is constitutional.

## II. *Discussion*

### A. *Summary Judgment Standard*

To grant a motion for summary judgment, there can be no "genuine issue as to any material fact" and the moving party must be "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313 (2d Cir.1981). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American Int'l Group, Inc. v. London American Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981), quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975). Moreover, there must be no controversy as to inferences which may be drawn from the facts of record. *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967). In determining whether or not there is a genuine factual issue in the case, the court must "resolve all ambiguities and draw all reasonable inferences against the moving party." *Schwabenbauer*, 667 F.2d at 313; *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). However, one against whom summary judgment is sought cannot rely on factually unsubstantiated conclusory allegations to sustain a claim that questions of fact exist. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552–53 (1986). That both sides have moved for summary judgment "does not mean that the court must grant judgment as a matter of law for one side or the other," *Schwabenbaur*, 667 F.2d at 314, and it is error to "assume that no material facts remain in dispute simply because both parties moved for summary judgment." *In re Citizens Loan & Sav. Co.*, 621 F.2d 911, 913 (8th Cir.1980) (citation omitted).

### B. *The Commerce Clause and the Twenty-first Amendment*

██ Judges must not, in the exercise of the judicial function, undertake to second-guess the political judgment of legisla-

---

**10.** For the importance of having definitive indications as to how any particular affirmation will be applied, *see Brown-Forman Distillers v. N.Y. Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), wherein the majority laments that "we have no means of predicting how the [New York] Liquor Authority would" react to an application for a price reduction following posting, and chastises the dissenters for "indulging [in the] assumption that the Authority will be sensitive to Commerce Clause concerns." *Id.* 106 S.Ct. at 2087, 2086 n. 5. The dissent, in turn, expressed the view that the Liquor Authority, like any agency "charged with rectifying questionable applications of necessarily general rules," was entitled to a presumption of constitutionality "consistent with the respect due state administrative organs responsible for the operation of a state law whose constitutionality is challenged...." *Id.* 106 S.Ct. at 2089–90. The ambiguity presented in *Brown-Forman* was avoided by the Commission's ruling. It is to be commended.

tors. Quite to the contrary, judges must refrain from reading their own policy preferences into the Constitution by striking down legislation deemed to be unwise or even foolish. *See, e.g., Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *see also 324 Liquor Corp. v. Duffy,* —— U.S. ——, 107 S.Ct. 720, 733–34, 93 L.Ed.2d 667 (1987). Although courts must determine whether a challenged statute is or is not constitutional—a task concededly involving judgment and interpretation—legislation is presumed constitutional unless clearly shown not to be so. *State v. Warren,* 169 Conn. 207, 217, 363 A.2d 91 (1975). Moreover, where a statute permits of two constructions, one valid and the other invalid as unconstitutional, the valid construction should be adopted "even where it is not the obvious one." *Lublin v. Brown,* 168 Conn. 212, 219–20, 362 A.2d 769 (1975).

A state's authority to regulate aspects of the liquor industry is greater than other areas of regulation by virtue of the twenty-first amendment. Section 2 of that amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors in violation of the laws thereof, is hereby prohibited." Section 2 "grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 110, 100 S.Ct. 937, 946, 63 L.Ed.2d 233 (1980). Because a state may entirely exclude alcoholic beverages from its markets, less restrictive forms of regulation are within a state's authority.

The Twenty-first Amendment thus gives the states broad power to ban, restrict, or otherwise regulate importation and in-state traffic in alcoholic beverages and thereby eliminates some of the otherwise applicable Commerce Clause constraints. For example, a state may prohibit entirely the sale of intoxicating liquors within its borders, *see State Board of Equalization v. Young's Market Co.,* 299 U.S. 59, 62–63, 57 S.Ct. 77, 78–79, 81 L.Ed. 38 (1936) although under traditional Commerce Clause limitations it could not ban the sale of other products, *see, e.g., Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. [511,] 521, 55 S.Ct. 497, 499–500, 79 L.Ed. 1032 [(1935)] (wholesome milk).... Or a state may prohibit local dealers from selling beer manufactured in another state on the ground that the latter state discriminate against beer manufactured in the first state, *see Indianapolis Brewing Co. v. Liquor Control Commission,* 305 U.S. 391, 59 S.Ct. 254, 83 L.Ed. 243 (1939), although it would not be free to impose the same type of restrictions with respect to milk, *see Great Atlantic & Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976); nor could it constitutionally prohibit the exportation of local ground water to another state on the basis that the latter state would forbid exportation of its water to the first state, *see Sporhase v. Nebraska,* 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982).

*Healy I,* 692 F.2d at 280–281 (other citations omitted).[11]

However, as *Healy I* states, not even in the area of regulating intoxicating beverages is the authority of a state absolute.[12] The twenty-first amendment "has

11. The distinction drawn by the Court of Appeals between milk and liquor may not be quite as sharp following the Supreme Court's decision in *Brown-Forman* in which the Court relied heavily on *Seelig* in overturning New York's affirmation statute.

12. The Supreme Court is currently divided as to how extensively the twenty-first amendment was intended to authorize state regulation of the liquor industry. *Compare* the opinion of the Court, (Powell, J.), in *324 Liquor Corp.,* 107 S.Ct. at 726 (the "States' Twenty-first Amendment

powers, though broad, are circumscribed by other provisions of the Constitution"), *with* the dissent, (O'Connor, J.), *id.* at 730 (endorsing former Justice Black's view "that the Senators who approved the Twenty-first Amendment thought they were returning absolute control over the liquor industry to the States"). *See also Newport v. Iacobucci,* —— U.S. ——, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986); *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984).

not operated totally to repeal the Commerce Clause in the area of the regulation of traffic in liquor." *Joseph E. Seagram & Sons v. Hostetter,* 384 U.S. 35, 42, 86 S.Ct. 1254, 1259, 16 L.Ed.2d 336 (1966). The commerce clause—though worded as a grant of affirmative power to Congress—has traditionally been interpreted to limit state action which affects economic activities outside its own borders. "In general the Commerce Clause is viewed as intending to promote free trade among the states and to liberate the flow of articles in commerce from the provincialism evident in local regulations." *Healy I,* 692 F.2d at 278.[13] State statutes which directly discriminate against interstate commerce or which favor in-state economic interests over out-of-state interests are per se unconstitutional. *See, e.g., City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Bacchus Imports.* Even where a state statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental," it will not be sustained if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citations omitted). "[T]here is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman,* 106 S.Ct. at 2084.

Thus, "the Twenty-first Amendment and the Commerce Clause 'each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case.'" *Id.* at 2087, quoting *Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 332, 84 S.Ct.

1293, 1298, 12 L.Ed.2d 350 (1964); *see Midcal,* 445 U.S. at 109, 100 S.Ct. at 945 (what is required in this area is a "pragmatic effort to harmonize state and federal powers").

### C. *The Affirmation Issue*

■ Against the foregoing general principles, the cases in the field of liquor affirmation must be examined for their application to the legislation adopted by Connecticut.

In *Seagram,* the Supreme Court unanimously upheld a New York requirement that alcoholic beverage brand owners affirm that the price charged to New York wholesalers was "no higher than the lowest price" than was charged anywhere in the country in the *preceding* month.

> The mere fact that § 9 [the price affirmation section] is geared to appellant's pricing policies in other States is not sufficient to invalidate the statute. As part of its regulatory scheme for the sale of liquor, New York may constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country. The serious discriminatory effects of § 9 alleged by appellants on their business outside New York are largely matters of conjecture.... It will be time enough to assess the alleged extraterritorial effects of § 9 when a case arises that clearly presents them. "The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids."

*Seagram,* 384 U.S. at 43, 86 S.Ct. at 1260, quoting *Osborn v. Ozlin,* 310 U.S. 53, 62, 60 S.Ct. 758, 761, 84 L.Ed. 1074 (1940). Although the Court thus rejected the argument that the New York affirmation law was facially invalid, it made clear that fu-

---

**13.** From the late nineteenth century until the New Deal, the commerce clause was used—often in conjunction with the due process clause of the fourteenth amendment—to invalidate numerous state regulatory measures. *See, e.g., Seelig.* From 1945 to 1970 the commerce clause was invoked rarely—and the due process clause hardly at all—to strike down economic legislation. In the last decade, the Supreme Court increasingly entertained objections to state statutes based on the burdens imposed on interstate commerce. *See, e.g., New England Power Co. v. New Hampshire,* 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982).

ture decisions would depend on the facts of each case. *See id.* at 52, 86 S.Ct. at 1265 ("it is possible that specific future application of [the statute] may engender concrete applications of constitutional dimension").

Indeed, the next challenge to New York's affirmation law, the challenge was successful. In *Brown-Forman,* the Court declared unconstitutional an amended version which required distillers to affirm that the price charged to New York wholesalers "is no higher than the lowest price at which such item of liquor *will be* sold by such [distiller] to any wholesaler anywhere" in the nation. Alcoholic Beverage Control Law § 101–b(3)(d) (McKinney Supp.1986) (emphasis added). The Court stressed the fact that, by requiring such an affirmation, New York made it illegal for distillers to reduce prices in other states during the following month in which the posted New York prices were in effect. By so doing, New York had " 'project[ed] its legislation' into other States" in violation of the commerce clause. *Brown-Forman,* 106 S.Ct. at 2087, quoting *Seelig,* 294 U.S. at 521, 55 S.Ct. at 499.

> While a State may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess. Economic protectionism is not limited to attempts to convey advantages on local merchants; it may include attempts to give local consumers an advantage over consumers in other States.... The mere fact that the effects of New York's [affirmation law] are triggered only by sales of liquor within the State of New York ... does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state.

*Id.* 106 S.Ct. at 2085.

The Court distinguished *Seagram* on the ground that the earlier version of New York's affirmation law was *retrospective* in nature—requiring only that the affirmed price be no higher than the lowest price at which sales were made during the *previous* month—whereas the amended version was *prospective.* Thus, the earlier version regulated the price charged in New York in relation to prices charged outside the state, whereas the later version limited prices charged outside the state for the month after the price was posted in New York. This was precisely the distinction relied on by the Second Circuit in *Healy I* in striking down Connecticut's original beer price affirmation law (which also had a prospective reach).

> The New York statute [in *Seagram* ] differed significantly from the Connecticut statute, because, unlike Connecticut's [original] beer price affirmation provisions which control brewers' *future* conduct in the states surrounding Connecticut, the New York law in *Seagram* merely required that New York prices reflect what had been charged elsewhere in the past. Thus, the New York law, although it affected the prices that manufacturers would choose to set in other states, did not limit the freedom of a manufacturer at any given time to raise or lower prices in any other state.

692 F.2d at 283.

*Brown-Forman* explicitly embraced *Healy I:*

> We agree with ... the *Healy* court that a "prospective" statute such as Connecticut's [original] beer affirmation statute, or New York's liquor affirmation statute, regulates out-of-state transactions in violation of the Commerce Clause. Once a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month. Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.... While New York may regulate the sale of liquor within its borders, and may seek lower prices for its residents [as it did in *Seagram* ], it may not "project its legislation into [other States] by regulating the price to be paid" for liquor in those States.

*Id.* at 2086 (citations omitted).

The 1984 amendments to Connecticut's beer affirmation statute make the affirmation statute neither retrospective nor pro-

spective but, rather, contemporaneous. Brewers must affirm that the price charged at 10:00 a.m. on the sixth day of each month to Connecticut wholesalers is no higher—*at that moment*—than the lowest price then being charged to wholesalers in the border states. The posted price must remain in effect in Connecticut for one month. Nonetheless, brewers and importers are free to raise or lower their prices in the border states. Of course a brewer or importer is still obliged to factor into its business decisions the recognition that its lowest price in any of the border states on the day of posting must be offered to Connecticut wholesalers for the ensuing month. The issue in the instant case, therefore, is whether Connecticut's requirement that prices to its wholesalers be fixed by pricing decisions in other states violates the commerce clause.

There is little doubt that Connecticut's present affirmation law would be constitutional under *Seagram*. The difficulty lies in assessing *Seagram's* precedent vitality. *Brown-Forman* decided only the questions presented in that case and left open the constitutionality of affirmation statutes less oppressive than the prospective legislation there struck down. Although the Court appeared to emphasize that the different result from that in *Seagram* resulted from the difference between retrospective and prospective affirmation laws, the Court qualified its analysis:

> While we hold that New York's prospective price affirmation statute violates the Commerce Clause, we do not necessarily attach constitutional significance to the difference between a prospective statute and the retrospective statute at issue in *Seagram.* Indeed, one could argue that the effects of the statute in *Seagram* do not differ markedly from the effects of the statute at issue in the present case. If there is a conflict between today's decision and the *Seagram* decision, however, there will be time enough to address that conflict should a case arise involving a retrospective statute. Because no such statute is before us now, we need not consider the continuing validity of *Seagram*.

*Id.* at 2087 n. 6. Justice Blackmun, who joined the opinion of the Court (except for footnote 6), filed a concurrence to state that he "would go further and overrule" *Seagram*, which he characterized as "a relic of the past":

> [*Seagram*] was decided when affirmation statutes were comparatively new and long before the proliferation of overlapping and potentially conflicting affirmation statutes that has taken place in the last two decades. I see no principled distinction that can be drawn for constitutional analysis between New York's current prospective statute and the same State's retroactive statute upheld in *Seagram*.... Either type, despite one's best efforts at fine tuning, operates to affect out-of-state transactions and violates the Commerce Clause. Our failure to overrule *Seagram* now merely preserves uncertainty and will breed or necessitate further litigation. We should face reality and overrule *Seagram*.

*Id.* at 2088.

Despite the "uncertainty" referred to by Justice Blackmun, Connecticut's beer affirmation statute is here held to be constitutional. Such a finding comports with the presumption of validity to which all economic regulatory legislation is entitled. Such a finding comports, also, with the spirit of the twenty-first amendment, which was intended to return broad control of the liquor industry to the states. And it accords with dicta in *Healy I* to the effect that "[g]iven the latitude allowed a state under the Twenty-first Amendment ... *Seagram* might well validate beer price regulation less intrusive than the present Connecticut statute, such as a requirement simply that a brewer set its Connecticut prices at the lowest levels it chooses to set in the surrounding states ... leaving those out-of-state prices unregulated by Connecticut." *Seagram*, 692 F.2d at 283–284.

Above all, such a finding is consistent with the Supreme Court's interpretation of the commerce clause as it has evolved to date. Whatever the future fate of *Seagram*, no other Justice joined Blackmun's call in *Brown-Forman* for its demise; it

remains to be considered by lower courts, unless and until it is formally overruled. *Cf. Healy I*, 532 F.Supp. at 1325 n. 48 (rejecting USBA's argument that *Seagram* must be relegated to a "different era" of constitutional adjudication). Under *Seagram*, Connecticut's affirmation statute is facially valid because, unlike the version in *Healy I* and *Brown-Forman*, it leaves brewers free to raise or lower prices in the border states before and after posting in Connecticut and does not, therefore, regulate interstate commerce. Although plaintiffs cite numerous excerpts from the legislative debates over beer price affirmation to show that many voted for the measure intended it to protect local wholesalers and retailers from the competition of wholesalers and retailers in the border states,[14] the price flexibility provided by the latest amendments destroys much, if not all, of the force of their argument. Moreover, Connecticut is not seeking lower or better prices for its wholesalers relative to out-of-state wholesalers, but simply equal prices. "The legislative intent to secure 'fairer' or 'more equal' competition can hardly be characterized as 'protectionist' within the meaning of the Commerce Clause." *Healy I*, 532 F.Supp. at 1323.

In addition to being facially valid, the statute also passes muster under the second of the two-tier standard enunciated in *Pike*. "[T]he critical consideration"—under either test—"is the overall effect of the statute on both local and interstate activity." *Brown-Forman*, 106 S.Ct. at 2084. Crediting USBA's assertions that some business of Connecticut residents previously going to border state retailers will shift to Connecticut retailers, and that some "artificially" high prices (in the border states) and/or some "artificially" low prices (in Connecticut) will result from beer price affirmation even as amended, the "mere fact" that an affirmation law "is geared to ... pricing policies in other States is not sufficient to invalidate the statute" because a state may "constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country," *Seagram*, 384 U.S. at 43, 86 S.Ct. at 1260, and because a "non-discriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981). Any state economic regulatory legislation exerts some impact on interstate commerce and courts should be cautious in striking down such legislation merely because "the faintest economic ripples begin to flow outside state borders...." *Brown-Forman*, 106 S.Ct. at 2091 n. 8 (Stevens, J., dissenting). The disincentive to Connecticut consumers to buy outside the state, not shown to be of more than minor economic significance, and the necessity that brewers set their prices in the border states knowing that they are simultaneously setting their prices in Connecticut are not an excessive intrusion on commerce. Because Connecticut's statute operates even-handedly and serves a legitimate purpose in reducing discrimination in pricing to wholesalers in Connecticut as opposed to out-of-state wholesalers, such incidental and indirect burdens on interstate commerce do not outweigh the resulting local benefits.

Finally, it is worth noting that the commerce clause, though often construed as restrictive of a state's authority, does not prohibit anything. It is a positive grant of authority to Congress to regulate matters of national economic importance. Since Connecticut is only one of over thirty states with affirmation laws, the problems posed by "over-lapping and potentially conflicting affirmation statutes," *id.* at 2088 (Blackmun, J., concurring)[15] are appropriate subjects for Congress to address—consistent, of course, with the limits imposed

---

14. On this point, see the district court opinion in *Healy I*, 532 F.Supp. at 1318 n. 16, 1323 n. 41.

15. Statutes, such as Connecticut's, enacted in several states, though overlapping, are unlikely to conflict, but, as pointed to prices at the lowest common denominator, are more likely to produce harmony, i.e., uniform low prices.

on both Congress and courts by the twenty-first amendment. To date, Congress has not done so. Plaintiffs may press their case in the national legislative arena, a better use of the powers created by the Constitution than to have this court strike down state regulatory legislation with a legitimate local purpose that does not impermissibly burden interstate commerce.

Accordingly, defendants' motion for summary judgment is granted.

SO ORDERED.