# HEALY ET AL. *v.* THE BEER INSTITUTE ET AL.

APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 88–449.   Argued March 28, 1989—Decided June 19, 1989*

*Together with No. 88–513, *Wine & Spirits Wholesalers of Connecticut, Inc.* v. *The Beer Institute et al.*, also on appeal from the same court.

*Robert F. Vacchelli*, Assistant Attorney General of Connecticut, argued the cause for appellants in both cases. With him on the briefs for appellants in No. 88–449 were *Joseph I. Lieberman*, former Attorney General, *Clarine Nardi Riddle*, Acting Attorney General, and *Richard M. Sheridan*, Assistant Attorney General. *William A. Wechsler* filed briefs for appellant in No. 88–513.

*Jeffrey I. Glekel* argued the cause for appellees in both cases. With him on the brief were *Jerome I. Chapman*, *Wayne C. Holcombe, William H. Allen, Timothy G. Reynolds*, and *Gary Nateman.*†

---

†Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Pennsylvania by *Morey M. Myers* and *Christopher A. Lewis;* and

JUSTICE BLACKMUN delivered the opinion of the Court.

The State of Connecticut requires out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers are, as of the moment of posting, no higher than the prices at which those products are sold in the bordering States of Massachusetts, New York, and Rhode Island. In these appeals, we are called upon to decide whether Connecticut's beer-price-affirmation statute violates the Commerce Clause.[1]

## I

Although appellees challenge Connecticut's beer-price-affirmation statute as amended in 1984, this litigation has its roots in the 1981 version of Connecticut's price-affirmation scheme. Having determined that the domestic retail price of beer was consistently higher than the price of beer in the three bordering States, and with the knowledge that, as a result, Connecticut residents living in border areas frequently crossed state lines to purchase beer at lower prices, Connecticut enacted a price-affirmation statute tying Connecticut beer prices to the prices charged in the border States. See *United States Brewers Assn., Inc.* v. *Healy*, 532 F. Supp. 1312, 1314, 1316–1317 (Conn. 1982). In an effort to eliminate the price differential between Connecticut and the border States, Connecticut required that brewers and importers (out-of-state shippers)[2] post bottle, can, and case prices for

---

for the Distilled Spirits Council of the United States, Inc., by *Arnold M. Lerman* and *Louis R. Cohen*.

[1] The Commerce Clause states: "The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." U. S. Const., Art. I, § 8, cl. 3. This Court long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or "dormant" limitation on the authority of the States to enact legislation affecting interstate commerce. See, *e. g., Hughes* v. *Oklahoma*, 441 U. S. 322, 326, and n. 2 (1979); *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 534–535 (1949).

[2] The Connecticut beer industry is divided into three marketing levels: (1) brewers and importers, (2) wholesalers, and (3) retailers. Participants

each brand of beer to be sold in Connecticut.  *Id.*, at 1317. These posted prices would take effect on the first day of the following month and would continue without change for the rest of that month.  Conn. Gen. Stat. Ann. § 30–63(c) (1975 and Supp. 1982).  The 1981 statute further required that out-of-state shippers affirm under oath at the time of posting that their posted prices were and would remain no higher than the lowest prices they would charge for each beer product in the border States during the effective period. § 30–63b(b), quoted in 532 F. Supp., at 1314, n. 3.  Moreover, in calculating the lowest price offered in the border States, the statute deducted from the reported price the value of any rebates, discounts, special promotions, or other inducements that the out-of-state shippers offered in one or more of the border States.[3]  § 30–63c(b), quoted in 532 F. Supp., at 1314, n. 4.  To the extent that such inducements lowered border-state prices, the statute thus obligated out-of-state shippers to lower their Connecticut prices as well.[4]

In 1982, a brewers' trade association and various beer producers and importers (a subset of the appellees in the instant litigation) filed suit in the United States District Court for the District of Connecticut, challenging the 1981 statute as

---

in each tier of the industry must obtain a license to sell to the tier below, with the retailers selling to the consuming public.  While generally each wholesaler carries the products of more than one brewer or importer (because Connecticut currently has no brewery of its own, brewers and importers are referred to collectively as "out-of-state shippers"), wholesalers may resell these products only to retailers within the geographic area specified in their respective licenses.  *United States Brewers Assn.* v. *Healy*, 669 F. Supp. 543, 545–546 (Conn. 1987); *United States Brewers Assn., Inc.* v. *Healy*, 532 F. Supp. 1312, 1317 (Conn. 1982).

[3] The affirmation statute did permit differentials in price based on differing state taxes and transportation costs.  Conn. Gen. Stat. § 30–63c(b) (1989).

[4] The statute also required out-of-state shippers to offer Connecticut wholesalers every package configuration for each brand of beer offered to wholesalers in the border States.  § 30–63c(b), quoted in 532 F. Supp., at 1314, n. 4.

unconstitutional under the Commerce Clause. The District Court, relying primarily on this Court's decision in *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35 (1966), upheld the 1981 law. *United States Brewers Assn., Inc.* v. *Healy*, 532 F. Supp., at 1325–1326. The Court of Appeals, however, reversed. It held that the 1981 Connecticut statute was facially invalid under the Commerce Clause because it had the practical effect of prohibiting out-of-state shippers from selling beer in any neighboring State in a given month at a price below what it had posted in Connecticut at the start of that month. The court explained: "Nothing in the Twenty-first Amendment permits Connecticut to set the minimum prices for the sale of beer in any other state, and well-established Commerce Clause principles prohibit the state from controlling the prices set for sales occurring wholly outside its territory." *United States Brewers Assn., Inc.* v. *Healy*, 692 F. 2d 275, 282 (CA2 1982) *(Healy I)*. This Court summarily affirmed. 464 U. S. 909 (1983).

In 1984, the Connecticut Legislature responded to *Healy I* by amending its beer-price-affirmation statute to its current form. The statute now requires out-of-state shippers to affirm that their posted prices are no higher than prices in the border States only at the time of the Connecticut posting. Conn. Gen. Stat. § 30–63b(b) (1989).[5] The legislature also

---

[5] As amended by 1984 Conn. Pub. Acts 332, § 30–63b(b) provides:

"At the time of posting of the bottle, can, keg or barrel and case price required by section 30–63, every holder of a manufacturer or out-of-state shipper's permit, or the authorized representative of a manufacturer, shall file with the department of liquor control a written affirmation under oath by the manufacturer or out-of-state shipper of each brand of beer posted certifying that, at the time of posting, the bottle, can or case price, or price per keg, barrel or fractional unit thereof, to the wholesaler permittees is no higher than the lowest price at which each such item of beer is sold, offered for sale, shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state."

In addition, Connecticut regulations now provide for posting on the sixth day of each month. App. 157.

added § 30–63b(e), which provides that nothing in § 30–63b prohibits out-of-state shippers from changing their out-of-state prices after the affirmed Connecticut price is posted.[6] The legislature, however, did not amend § 30–63a(b), which continued to make it unlawful for out-of-state shippers to sell beer in Connecticut at a price higher than the price at which beer is or would be sold in any bordering State during the month covered by the posting.[7]

In the wake of the 1984 amendments, appellees (a brewers' trade association and major producers and importers of beer) filed suit in the United States District Court for the District of Connecticut, seeking declaratory and injunctive relief and claiming that the effect of the amended law was not different from that of the law struck down in *Healy I*.[8] See *United States Brewers Assn.* v. *Healy*, 669 F. Supp. 543, 544–545 (1987). In response to appellees' complaint, Connecticut filed a "Declaratory Ruling" by the Department of Liquor Control, interpreting the statute as amended as requiring out-of-state shippers to affirm that their posted prices in Connecticut were no higher than their lowest prices in any

---

[6] As added by 1984 Conn. Pub. Acts 332, § 30–63b(e) provides:

"This section shall not prohibit a manufacturer or out-of-state shipper permittee or the authorized representative of a manufacturer from changing prices to any wholesaler in any other state of the United States or in the District of Columbia, or to any state or agency of a state which owns and operates retail liquor outlets at any time during the calendar month covered by such posting."

[7] Conn. Gen. Stat. § 30–63a(b) provides in relevant part:

"No holder of any manufacturer or out-of-state shipper's permit shall ship, transport or deliver within this state, or sell or offer for sale to a wholesaler permittee any brand of beer . . . at a bottle, can or case price, or price per keg, barrel or fractional unit thereof, higher than the lowest price at which such item is then being sold or offered for sale or shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state."

[8] Appellants are the Connecticut officials responsible for enforcing the affirmation statute, and the liquor-wholesalers trade association which entered the case as an intervenor.

border State *only* at the time of posting—the sixth day of each month. *Id.,* at 547, and n. 9. After the moment of posting, the ruling stated, the statute imposes no restrictions on the right of out-of-state shippers to raise or lower their border-state prices at will. *Ibid.*

Appellees argued, however, that the Connecticut beer-affirmation statute, even as modified by the declaratory ruling, regulated out-of-state transactions, constituted economic protectionism, and unduly burdened interstate commerce, all in violation of the Commerce Clause. On cross-motions for summary judgment, the District Court upheld the statute as modified by the legislature and construed in the Department of Liquor Control's declaratory ruling, resting its decision on *Seagram, supra,* and distinguishing this Court's subsequent decision in *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority,* 476 U. S. 573 (1986), which struck down a statute analogous to Connecticut's 1981 beer-affirmation statute. The District Court found the 1984 Connecticut law constitutional on its face because, "unlike the version in *Healy I* and *Brown-Forman,*" the 1984 law "leaves brewers free to raise or lower prices in the border states before and after posting in Connecticut and does not, therefore, regulate interstate commerce." 669 F. Supp., at 553.

As in *Healy I,* the Court of Appeals reversed. It held that the 1984 law (even as interpreted by the declaratory ruling), like its predecessor, violated the Commerce Clause by controlling the prices at which out-of-state shippers could sell beer in other States. First, and foremost, the court held that the Connecticut statute's "purposeful interaction with border-state regulatory schemes" means that shippers cannot, as a practical matter, set prices based on market conditions in a border State without factoring in the effects of those prices on its future Connecticut pricing options. *In re Beer Institute,* 849 F. 2d 753, 760–761 (CA2 1988) *(Healy II).* Second, the Court of Appeals found that the 1984 statute unconstitutionally restricted the ability of out-of-state shippers

to offer volume discounts in the border States.  *Id.*, at 760. Furthermore, relying on *Brown-Forman, supra,* the court rejected appellants' argument that the statute was a proper exercise of its regulatory authority under the Twenty-first Amendment.  849 F. 2d, at 761.

We noted probable jurisdiction.  488 U. S. 954 (1988).

## II

In deciding this appeal, we engage in our fourth expedition into the area of price-affirmation statutes.  The Court first explored this territory in *Seagram,* where it upheld against numerous constitutional challenges a New York statute that required liquor-label owners or their agents to affirm that "'the bottle and case price of liquor . . . is no higher than the lowest price'" at which such liquor was sold "anywhere in the United States during the preceding month."  384 U. S., at 39–40, quoting the New York law.  The Court ruled that the mere fact that the New York statute was geared to appellants' pricing policies in other States did not violate the Commerce Clause, because under the Twenty-first Amendment's broad grant of liquor regulatory authority to the States, New York could insist that liquor prices offered to domestic wholesalers and retailers "be as low as prices offered elsewhere in the country."  *Id.*, at 43.  Although the appellant brand owners in *Seagram* had alleged that the New York law created serious discriminatory effects on their business outside New York, the Court considered these injuries too conjectural to support a facial challenge to the statute and suggested that the purported extraterritorial effects could be assessed in a case where they were clearly presented.  *Ibid.*

Eighteen years after *Seagram,* we summarily affirmed the Second Circuit's judgment in *Healy I,* and then, another two years later, granted plenary review in *Brown-Forman, supra.*  The New York law at issue in *Brown-Forman* required every liquor distiller or producer selling to wholesalers within the State to affirm that the prices charged for

every bottle or case of liquor were no higher than the lowest price at which the same product would be sold in any other State during the month covered by the particular affirmation. 476 U. S., at 576. Appellant Brown-Forman was a liquor distiller that offered "promotional allowances" to wholesalers purchasing Brown-Forman products. The New York Liquor Authority, however, did not allow Brown-Forman to operate its rebate scheme in New York and, moreover, determined for the purposes of the affirmation law that the promotional allowances lowered the effective price charged to wholesalers outside New York. Because other States with affirmation laws similar to New York's did not deem the promotional allowances to lower the price charged to wholesalers, appellant argued that the New York law offered the company the Hobson's choice of lowering its New York prices, thereby violating the affirmation laws of other States, or of discontinuing the promotional allowances altogether. This, appellant alleged, amounted to extraterritorial regulation of interstate commerce in violation of the Commerce Clause. *Id.*, at 579–582.

This Court agreed, reaffirming and elaborating on our established view that a state law that has the "practical effect" of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause. We began by reviewing past decisions, starting with *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935). The Court in *Seelig* struck down a New York statute that set minimum prices for milk purchased from producers in New York and other States and banned the resale within New York of milk that had been purchased for a lower price. Because Vermont dairy farmers produced milk at a lower cost than New York dairy farmers, the effect of the statute was to eliminate the competitive economic advantage they enjoyed by equalizing the price of milk from all sources. Writing for the Court, Justice Cardozo pronounced that the Commerce Clause does not permit a State "to establish a wage scale or a scale of prices for use

in other states, and to bar the sale of the products . . . unless the scale has been observed." *Id.*, at 528. Relying on *Seelig*, the Court in *Brown-Forman* concluded: "While a State may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess." 476 U. S., at 580; see also *Schwegmann Brothers Giant Super Markets* v. *Louisiana Milk Comm'n*, 365 F. Supp. 1144, 1152–1156 (MD La. 1973), summarily aff'd, 416 U. S. 922 (1974). After drawing upon *Seelig*, the *Brown-Forman* Court also discussed *Healy I* with approval. There, as we have noted, the Court of Appeals struck down an earlier version of Connecticut's price-affirmation statute, which was essentially identical to the one at issue in *Brown-Forman*, because the statute "made it impossible for a brewer to lower its price in a bordering State in response to market conditions so long as it had a higher posted price in effect in Connecticut." 476 U. S., at 581–582.[9]

---

[9] The *Brown-Forman* Court cited a third extraterritorial decision, *Edgar* v. *MITE Corp.*, 457 U. S. 624 (1982), which, though not discussed at length there, significantly illuminates the contours of the constitutional prohibition on extraterritorial legislation. In *MITE Corp.*, the Court struck down the Illinois Business Takeover Act, which required that a takeover offer for a target company having a specified connection to Illinois be registered with the Secretary of State and mandated that such an offer was not to become effective for 20 days, during which time the offer would be subject to administrative evaluation. The statute empowered the Secretary of State to deny registration of the tender offer under certain conditions, such as inequity or fraud. A plurality found the statute to be infirm under the Commerce Clause because it "directly regulates transactions which take place across state lines, even if wholly outside the State of Illinois." *Id.*, at 641. The plurality observed that, if the target company had sufficient in-state contacts, the Illinois law, unless complied with, could prevent interstate-securities transactions in stock even if not a single one of the target company's shareholders was a resident of Illinois. Moreover, the plurality noted that if Illinois were free to enact such legislation, others States similarly were so empowered, "and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled." *Id.*, at 642. Under the Commerce Clause the projection of these extrater-

Applying these principles, we concluded that the New York statute had an impermissible extraterritorial effect: "Once a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month. Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Id.*, at 582 (footnote omitted). Although New York might regulate the sale of liquor within its borders, and might seek low prices for its residents, it was prohibited by the Commerce Clause from "'project[ing] its legislation into [other States] by regulating the price to be paid'" for liquor in those States. *Id.*, at 583, quoting *Seelig*, 294 U. S., at 521. Despite the language in *Seagram*, the Court did not find the prospect of these extraterritorial effects to be speculative. The majority rejected as "Pollyannaish" the dissent's suggestion that flexible application by the relevant administrative bodies would obviate the problem and noted that the proliferation of affirmation laws after *Seagram* had greatly multiplied the likelihood that distillers would be subject to blatantly inconsistent obligations.[10]

The Court squarely rejected New York's argument that the Twenty-first Amendment, which bans the importation or possession of intoxicating liquors into a State "in violation of the laws thereof," saved the statute from invalidation under the Commerce Clause. Although the Court acknowledged that the Amendment vested in New York considerable au-

---

ritorial "'practical effect[s],'" regardless of the statute's intention, "'exceed[ed] the inherent limits of the State's power.'" *Id.*, at 642–643, quoting *Shaffer* v. *Heitner*, 433 U. S. 186, 197 (1977).

[10] At the time of our decision in *Brown-Forman*, 39 States, including New York, had adopted affirmation laws. Of these, 18, known as "control" States, each purchased all liquor to be distributed and consumed within its borders. These States subscribed to a standard sales contract that required distillers to guarantee that the price charged the State was no higher than the lowest price offered anywhere in the United States. Twenty States had adopted statutes similar to the New York statute that was under challenge. See 476 U. S., at 576, and n. 1.

thority to regulate the domestic sale of alcohol, the Amendment did not immunize the State from the Commerce Clause's proscription of state statutes that regulate the sale of alcohol in other States. 476 U. S., at 585. Accordingly, the Court's conclusion that the New York law regulated out-of-state sales conclusively resolved the Twenty-first Amendment issue against New York. *Ibid.*

The Court acknowledged that its *Brown-Forman* decision was in considerable tension with *Seagram*. The statutes at issue in the two cases were, it observed, factually distinguishable: the *Seagram* statute was retrospective, tying New York prices to out-of-state prices charged during the *previous* month, while the *Brown-Forman* statute was prospective, mandating that New York prices could be no higher than out-of-state prices for the *following* month. But the Court explicitly refused to give this retrospective/prospective distinction any constitutional significance, and even suggested that the effects of the two statutes might well be the same for the purposes of constitutional analysis. Nonetheless, since the Court was not squarely presented with a retrospective statute, it declined to evaluate *Seagram*'s continued validity. 476 U. S., at 584, n. 6.[11]

## III

In light of this history, we now must assess the constitutionality of the Connecticut statute, which is neither prospective nor retrospective, but rather "contemporaneous." As explained above, the statute requires only that out-of-state shippers affirm that their prices are no higher than the prices being charged in the border States as of the moment of affirmation.

The principles guiding this assessment, principles made clear in *Brown-Forman* and in the cases upon which it relied, reflect the Constitution's special concern both with the main-

---

[11] One Member of the Court concurred separately to advocate that *Seagram* then be overruled as a "relic of the past." *Id.*, at 586.

tenance of a national economic union unfettered by state-imposed limitations on interstate commerce[12] and with the autonomy of the individual States within their respective spheres.[13] Taken together, our cases concerning the extra-territorial effects of state economic regulation stand at a minimum for the following propositions: First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Edgar* v. *MITE Corp.*, 457 U. S. 624, 642–643 (1982) (plurality opinion); see also *Brown-Forman*, 476 U. S., at 581–583; and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states," *Seelig*, 294 U. S., at 528. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. *Brown-Forman*, 476 U. S., at 579. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the

---

[12] The entire Constitution was "framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523 (1935).

[13] The plurality in *Edgar* v. *MITE Corp.* noted: "The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power.'" 457 U. S., at 643, quoting *Shaffer* v. *Heitner*, 433 U. S., at 197.

Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. Cf. *CTS Corp.* v. *Dynamics Corp. of America,* 481 U. S. 69, 88–89 (1987). And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another. *Brown-Forman,* 476 U. S., at 582.[14]

When these principles are applied to Connecticut's contemporaneous price-affirmation statute, the result is clear. The Court of Appeals correctly concluded that the Connecticut statute has the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State. Moreover, the practical effect of this affirmation law, in conjunction with the many other beer-pricing and affirmation laws that have been or might be enacted throughout the country, is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude.

First, as explained by the Court of Appeals, the interaction of the Connecticut affirmation statute with the Massa-

---

[14] As a general matter, the Court has adopted a two-tiered approach to analyzing state economic regulation under the Commerce Clause. We summarized in *Brown-Forman:*

"When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." 476 U. S., at 579 (citations omitted).

We further recognized in *Brown-Forman* that the critical consideration in determining whether the extraterritorial reach of a statute violates the Commerce Clause is the overall effect of the statute on both local and interstate commerce. *Ibid.* Our distillation of principles from prior cases involving extraterritoriality is meant as nothing more than a restatement of those specific concerns that have shaped this inquiry.

chusetts beer-pricing statute (which does not link domestic prices with out-of-state prices) has the practical effect of controlling Massachusetts prices. See 849 F. 2d, at 759. Massachusetts requires brewers to post their prices on the first day of the month to become effective on the first day of the following month. See Mass. Gen. Laws § 138:25B (1986). Five days later, however, those same brewers, in order to sell beer in Connecticut, must affirm that their Connecticut prices for the following month will be no higher than the lowest price that they are charging in any border State. Accordingly, on January 1, when a brewer posts his February prices for Massachusetts, that brewer must take account of the price he hopes to charge in Connecticut during the month of March. Not only will the January posting in Massachusetts establish a ceiling price for the brewer's March prices in Connecticut, but also, under the requirements of the Massachusetts law, the brewer will be locked into his Massachusetts price for the entire month of February (absent administrative leave) even though the Connecticut posting will have occurred on February 6. Thus, as a practical matter, Connecticut's nominally "contemporaneous" affirmation statute "prospectively" precludes the alteration of out-of-state prices after the moment of affirmation. More generally, the end result of the Connecticut statute's incorporation of out-of-state prices, as the Court of Appeals concluded, is that "[a] brewer can . . . undertake competitive pricing based on the market realities of either Massachusetts or Connecticut, but not both, because the Connecticut statute ties pricing to the regulatory schemes of the border states." 849 F. 2d, at 759. In other words, the Connecticut statute has the extraterritorial effect, condemned in *Brown-Forman*, of preventing brewers from undertaking competitive pricing in Massachusetts based on prevailing market conditions.

Second, because New York law requires that promotional discounts remain in effect for 180 days, see N. Y. Alco. Bev. Cont. Law § 55-b(2) (McKinney 1987), and the Connecticut

statute treats promotional discounts as a reduction in price, the interaction of the New York and Connecticut laws is such that brewers may offer promotional discounts in New York only at the cost of locking in their discounted New York price as the ceiling for their Connecticut prices for the full 180 days of the New York promotional discount.

Third, because volume discounts are permitted in Massachusetts, New York, and Rhode Island, but not in Connecticut, the effect of Connecticut's affirmation scheme is to deter volume discounts in each of these other States, because the lowest of the volume-discounted prices would have to be offered as the regular price for an entire month in Connecticut. See 849 F. 2d, at 760.

With respect to both promotional and volume discounts, then, the effect of the Connecticut statute is essentially indistinguishable from the extraterritorial effect found unconstitutional in *Brown-Forman*. The Connecticut statute, like the New York law struck down in *Brown-Forman*, requires out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions. As we specifically reaffirmed in *Brown-Forman*, States may not deprive businesses and consumers in other States of "whatever competitive advantages they may possess" based on the conditions of the local market. 476 U. S., at 580. The Connecticut statute does precisely this.

The Commerce Clause problem with the Connecticut statute appears in even starker relief when it is recalled that if Connecticut may enact a contemporaneous affirmation statute, so may each of the border States and, indeed, so may every other State in the Nation. Suppose, for example, that the border States each enacted statutes essentially identical to Connecticut's. Under those circumstances, in January, when a brewer posts his February prices in Connecticut and the border States, he must determine those prices knowing

that the lowest bottle, can, or case price in any State would become the maximum bottle, can, or case price the brewer would be permitted to charge throughout the region for the month of March. This is true because in February, when the brewer posts his March prices in each State, he will have to affirm that no bottle, can, or case price is higher than the lowest bottle, can, or case price in the region—and these "current" prices would have been determined by the January posting. Put differently, unless a beer supplier declined to sell in one of the States for an entire month, the maximum price in each State would be capped by previous prices in the other State. This maximum price would almost surely be the minimum price as well, since any reduction in either State would permanently lower the ceiling in both. Nor would such "price gridlock" be limited to individual regions. The short-circuiting of normal pricing decisions based on local conditions would be carried to a national scale if a significant group of States enacted contemporaneous affirmation statutes that linked in-state prices to the lowest price in any State in the country. This kind of potential regional and even national regulation of the pricing mechanism for goods is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes.

## IV

The Connecticut statute, moreover, violates the Commerce Clause in a second respect: On its face, the statute discriminates against brewers and shippers of beer engaged in interstate commerce. In its previous decisions, this Court has followed a consistent practice of striking down state statutes that clearly discriminate against interstate commerce, see, *e. g., New Energy Co. of Indiana* v. *Limbach*, 486 U. S. 269 (1988); *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941 (1982); *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27 (1980), unless that discrimination is demonstrably

justified by a valid factor unrelated to economic protection-
ism, see, *e. g.*, *Maine* v. *Taylor*, 477 U. S. 131 (1986). By
its plain terms, the Connecticut affirmation statute applies
solely to interstate brewers or shippers of beer, that is,
either Connecticut brewers who sell both in Connecticut *and*
in at least one border State or out-of-state shippers who sell
both in Connecticut and in at least one border State. Under
the statute, a manufacturer or shipper of beer is free to
charge wholesalers within Connecticut whatever price it
might choose so long as that manufacturer or shipper does
not sell its beer in a border State. This discriminatory treat-
ment establishes a substantial disincentive for companies
doing business in Connecticut to engage in interstate com-
merce, essentially penalizing Connecticut brewers if they
seek border-state markets and out-of-state shippers if they
choose to sell both in Connecticut and in a border State. We
perceive no neutral justification for this patent discrimina-
tion. Connecticut has claimed throughout this litigation that
its price-affirmation laws are designed to ensure the lowest
possible prices for Connecticut consumers. While this may
be a legitimate justification for the statute, it is not advanced
by, in effect, exempting brewers and shippers engaging in
solely domestic sales from the price regulations imposed on
brewers and shippers who engage in sales throughout the
region.

## V

### A

Appellants advance two basic arguments in defense of
Connecticut's statute: first, that the Twenty-first Amend-
ment sanctions Connecticut's affirmation statute regardless
of its effect on interstate commerce; and, second, that the
statute is constitutional under this Court's analysis in *Joseph
E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35 (1966), in
which the Court stated that a retrospective affirmation stat-
ute does not violate the Commerce Clause merely because
it is geared to prices in other States. Appellants' reliance

on the Twenty-first Amendment is foreclosed by *Brown-Forman*, where we explicitly rejected an identical argument. In *Brown-Forman*, the Court specifically held that the Twenty-first Amendment does not immunize state laws from invalidation under the Commerce Clause when those laws have the practical effect of regulating liquor sales in other States. 476 U. S., at 585. Here, as in *Brown-Forman*, our finding of unconstitutional extraterritorial effects disposes of the Twenty-first Amendment issue. Appellants' reliance on *Seagram* is similarly foreclosed by *Brown-Forman*. While our decision in *Brown-Forman* did not overrule *Seagram*, it strictly limited the scope of that decision to retrospective affirmation statutes.

B

More important, *Brown-Forman* removed the legal underpinnings of *Seagram*'s Commerce Clause analysis. 476 U. S., at 581–584, and n. 6. *Seagram* rested on the following reasoning: the Twenty-first Amendment gives States wide latitude in the field of liquor regulation; although such state regulation might violate the Commerce Clause in some extreme instances, in particular where a State's regulations controlled liquor commerce outside the State's boundaries, the extraterritorial effects of New York's retrospective affirmation statute were too conjectural to support such a claim. 384 U. S., at 42–43. *Brown-Forman*, however, holds unequivocally that to the extent that an affirmation statute has the practical effect of regulating out-of-state liquor prices, it cannot stand under the Commerce Clause irrespective of the Twenty-first Amendment. 476 U. S., at 585. In striking down the statute at issue, the Court in *Brown-Forman* found, in light of 20 years of experience with the affirmation laws that proliferated after *Seagram*, that prospective affirmation statutes have such extraterritorial effects. Indeed, *Brown-Forman* leaves *Seagram* intact only to the extent that the Court in the former case felt no compulsion, in a case not directly raising the question, to address whether

retrospective affirmation shared the extraterritorial effects of prospective affirmation laws. 476 U. S., at 584, n. 6.

In the interest of removing any lingering uncertainty about the constitutional validity of affirmation statutes and of avoiding further litigation on the subject of liquor-price affirmation, we recognize today what was all but determined in *Brown-Forman:* to the extent that *Seagram* holds that retrospective affirmation statutes do not facially violate the Commerce Clause, it is no longer good law. Retrospective affirmation statutes, like other affirmation statutes, have the inherent practical extraterritorial effect of regulating liquor prices in other States. By tying maximum future prices in one State to the lowest prices in other States as determined at a specified time in the past, retrospective affirmation laws control pricing decisions in nonaffirmation States by requiring that those decisions reflect not only local market conditions, but also market conditions in the affirmation States — market conditions that would be irrelevant absent the binding force of the affirmation statutes. Every pricing decision made in a nonaffirmation State will reflect the certain knowledge that the price chosen will become in the future the maximum permissible price in the States requiring affirmation.[15] For the reasons noted today and in *Brown-Forman*, this extraterritorial effect violates the Commerce Clause.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

[15] Recent economic scholarship confirms:

"[B]oth [prospective and retrospective] types of price affirmation burden interstate commerce because they both cause firms to consider jointly their demand and marginal cost curves in more than one state. Accordingly, the impact of an affirmation law adopted by one state will be transmitted to other states, affecting prices charged in those other states in the process." Pustay & Zardkoohi, An Economic Analysis of Liquor Price Affirmation Laws: Do They Burden Interstate Commerce?, 48 La. L. Rev. 649, 673–674 (1988).

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join the Court's disposition of this suit and Parts I and IV of its opinion. The Connecticut statute's invalidity is fully established by its facial discrimination against interstate commerce—through imposition of price restrictions exclusively upon those who sell beer not only in Connecticut but also in the surrounding States—and by Connecticut's inability to establish that the law's asserted goal of lower consumer prices cannot be achieved in a nondiscriminatory manner.* See *New Energy Co. of Indiana* v. *Limbach*, 486 U. S. 269, 276–277, 279–280 (1988). This is so despite the fact that the law regulates the sale of alcoholic beverages, since its discriminatory character eliminates the immunity afforded by the Twenty-first Amendment. See *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 275–276 (1984). Since *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35 (1966), upheld a law that operated in like fashion, I agree with the Court that today's decision requires us to overrule that case. See *ante*, at 343.

---

*The dissent argues that the facial discrimination inherent in the present statute does not establish its invalidity because no brewer does business solely in Connecticut and because there is no evidence that any shipper sells beer exclusively within that State. *Post*, at 348. As far as I know we have never required a plaintiff to show that a statute which facially discriminates against out-of-state business in fact benefits a particular in-state business, and we have flatly rejected the kindred contention that the plaintiff could not prevail if the benefit to in-state business was minimal, see *New Energy Co. of Indiana* v. *Limbach*, 486 U. S. 269, 276–277 (1988). It would make little sense to require a showing that an in-state business in fact exists without also requiring a showing that it is in fact benefited. I see no reason to impose such a burden in order to strike down a statute that is facially discriminatory under the Commerce Clause, any more than we would require the person challenging under the Fourteenth Amendment a state law permitting only Aleuts to vote by mail to show that there are in fact Aleut citizens of the State capable of benefiting from that discrimination.

I would refrain, however, from applying the more expansive analysis which finds the law unconstitutional because it regulates or controls beer pricing in the surrounding States. See *ante*, at 335–340. It seems to me this rationale is not only unnecessary but also questionable, resting as it does upon the mere economic reality that the challenged law will require sellers in New York, Massachusetts, and Rhode Island to take account of the price that they must post and charge in Connecticut when setting their prices in those other States. The difficulty with this is that innumerable valid state laws affect pricing decisions in other States — even so rudimentary a law as a maximum price regulation. Suppose, for example, that the Connecticut Legislature had simply provided that beer could not be retailed in Connecticut above $10 a case. Sellers in those portions of New York, Massachusetts, and Rhode Island bordering Connecticut would have to take account of that requirement, just as sellers in those States had to take account of the Connecticut posting requirement here, because prices substantially above the maximum would cause their former in-state purchasers to drive to Connecticut and their former Connecticut purchasers to stay home. The out-of-state impact in this particular example would not be as severe as that in the present cases, but I do not think our Commerce Clause jurisprudence should degenerate into disputes over degree of economic effect. In any case, since this principle is both dubious and unnecessary to decide the present cases, I decline to endorse it.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, dissenting.

In *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), the Court held that a New York statute setting minimum prices for milk sold in that State violated the Commerce Clause when applied to milk produced more cheaply in Vermont but imported into New York for sale. Today the Court applies the doctrine of that case to invalidate a Connecticut statute which sets a maximum price for beer imported into

Connecticut from other States. The Court's analysis seems wrong to me both as a matter of economics and as a matter of law: the maximum prices set by Connecticut in this case have a quite different effect than did the minimum prices set by New York in the *Baldwin* case, and by reason of the Twenty-first Amendment the States possess greater authority to regulate commerce in beer than they do commerce in milk.

The New York statute passed upon in *Baldwin* provided that no milk could be sold in the New York City metropolitan area unless it had been purchased from the producer for a price at least equal to the minimum specified by law. When this statute was applied to milk produced in Vermont but brought into the New York City metropolitan area for sale, the result was to require Vermont producers to give up the natural advantage which they would otherwise have obtained from the fact that the costs of production of milk in Vermont were lower than the costs of production in New York. The Court rightly held that this sort of a regulation violated the Commerce Clause because it "set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." *Id.*, at 521. In *Milk Control Board* v. *Eisenberg Farm Products*, 306 U. S. 346 (1939), decided four years after *Baldwin*, the Court upheld a different state milk price regulation, and in so doing distinguished *Baldwin* as a case in which "this Court condemned an enactment aimed solely at interstate commerce attempting to affect and regulate the price to be paid for milk in a sister state." 306 U. S. at 353.

The Connecticut statute here is markedly different from the New York statute condemned in *Baldwin*. Connecticut has no motive to favor local brewers over out-of-state brewers, because there *are* no local brewers. *Ante*, at 327, n. 2. Its motive—unchallenged here—is to obtain from out-of-state brewers prices for Connecticut retailers and Connecticut beer drinkers as low as those charged by the brewers in neighboring States. Connecticut does not seek to erect any

sort of tariff barrier to exclude out-of-state beer; its residents will drink out-of-state beer if they drink beer at all, and the State simply wishes its inhabitants to be treated as favorably as those of neighboring States by the brewers who sell interstate. There is no "tariff wall" between Connecticut and other States; there is only a maximum price regulation with which the interstate brewer would rather not have to bother. But that is not a sufficient reason for saying that such a regulation violates the Commerce Clause.

Neither the parties nor the Court points to any concrete evidence that the Connecticut regulation will have any effect on the beer prices charged in other States, much less a constitutionally impermissible one. It is merely assumed that consumers in the neighboring States possess "competitive advantages" over Connecticut consumers. *Ante*, at 339. But it is equally possible that Connecticut's affirmation laws, a response to a history of unusually high beer prices in that State, see *United States Brewers Assn., Inc.* v. *Healy*, 692 F. 2d 275, 276 (1982), may be justifiable as a remedy for some market imperfection that permits supracompetitive prices to be charged Connecticut consumers. The Court expresses the view that these regulations will affect the prices of beer in other States and goes on to say that such an effect constitutes "regulating" or "controlling" beer sales beyond its borders. *Ante*, at 337, 342. But this view is simply the Court's personal forecast about the business strategies that distributors may use to set their prices in light of regulatory obligations in various States. Certainly a distributor that considers the Connecticut affirmation law when setting its prices in Massachusetts, or offering a discount in New York, is under no legal obligation to do so. And it is quite arbitrary, and inconsistent with other Commerce Clause doctrine, to strike down Connecticut's affirmation law because together with the laws of neighboring States it might require a brewer to plan its pricing somewhat farther in advance, *ante*, at 337–338, than it would prefer to do in a totally unregulated economy.

"[T]he question is not whether what [the State] has done will restrict appellants' freedom of action outside [the State] by subjecting the exercise of such freedom to financial burdens. The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Osborn* v. *Ozlin*, 310 U. S. 53, 62 (1940). See also *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35, 43 (1966).

I am no more convinced by the Court's alternative rationale, that the Connecticut statute "facially discriminates" against brewers and shippers of beer engaged in interstate commerce in favor of brewers and shippers who do business wholly within Connecticut. *Ante*, at 340. As the Court acknowledges, there are no Connecticut brewers, *ante*, at 327, n. 2, and the Court has not pointed to any evidence of shippers doing business in Connecticut but not in its border States. Consequently, the Court strikes down Connecticut's statute because it facially discriminates in favor of entities that apparently do not exist. But cf. *Amerada Hess Corp.* v. *Director, New Jersey Division of Taxation*, 490 U. S. 66, 77–78 (1989) (absence of oil reserves in New Jersey allays concern about a discriminatory motive or effect of a state tax disallowance of a deduction related to oil production). We do not know what actions Connecticut might take to eliminate discriminatory effects if a local brewer began business and a true danger of discrimination in favor of local business appeared. It is not a proper exercise of our constitutional power to invalidate state legislation as facially discriminatory just because it has not taken into account every hypothetical circumstance that might develop in the market.

All of the foregoing is based on the assumption that a State has no more freedom to regulate commerce in beer than it does commerce in milk or any other commodity. But the Twenty-first Amendment, as the Court concedes, at least in theory, provides otherwise:

"The transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Less than 10 years ago we acknowledged that the Twenty-first Amendment confers on the States "virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *California Retail Liquor Dealers Association* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 110 (1980). And while this "special power" of the States to regulate liquor, *id.*, at 108, must coexist with Congress' power to regulate commerce, "[t]his Court's decisions . . . have confirmed that the Amendment primarily created an exception to the normal operation of the Commerce Clause." *Craig* v. *Boren,* 429 U. S. 190, 206 (1976). The Court in the present cases barely pays lipservice to the additional authority of the States to regulate commerce and alcoholic beverages granted by the Twenty-first Amendment. Neglecting to consider that increased authority is especially disturbing here where the perceived proscriptive force of the Commerce Clause does not flow from an affirmative legislative decision and so is at its nadir. Even the most restrictive view of the Twenty-first Amendment should validate Connecticut's efforts to obtain from interstate brewers prices for its beer drinkers which are as favorable as the prices which those brewers charge in neighboring States.

The result reached by the Court in these cases can only be described as perverse. A proper view of the Twenty-first Amendment would require that States have greater latitude under the Commerce Clause to regulate producers of alcoholic beverages than they do producers of milk. But the Court extends to beer producers a degree of Commerce Clause protection that our cases have never extended to milk producers. I would reverse the judgment of the Court of Appeals.