The Honorable Dean Elliott State Representative 136 Apple Blossom Loop Maumelle, AR 72113-6031
Dear Representative Elliott:
I am writing in response to your request for my opinion on the following question:
 Is it legal for a board to establish the price schedule of maximum manufacturer prices for prescription drugs sold in the state after consideration of the prices charged for prescription drugs in Canada and Mexico, the prices listed on the federal supply schedule for pharmaceuticals and drugs maintained by the United States Department of Veterans Affairs and any other relevant information?
The conditions you recite in your request are prescribed in proposed legislation currently pending in the General Assembly as H.B. 1145.
RESPONSE
In my opinion, if the prices are pegged to track the indices named in your request, the practice you describe might well constitute an unlawful delegation of legislative power in violation of Ark. Const. art. IV, §§ 1 and 2, and Ark. Const. amend. VII. I further believe the practice might violate the commerce clause, U.S. Const. art. I, § 8, cl. 3.
The question initially arises whether it would be permissible for the legislature to assign an executive board the responsibility of setting drug prices. Under the separation-of-powers doctrine set forth in Ark. Const. art. IV, §§ 1 and 2, the executive, legislative and judicial branches are charged with performing distinct functions. Amendment VII to the Arkansas Constitution provides that "[t]he legislative power of the people of this State shall be vested in a General Assembly." It is clearly established that" although the General Assembly cannot delegate its power to make a law, it can make a law and prescribe the condition upon which it may become operative." Leathers v. Gulf Rice Arkansas, Inc.,338 Ark. 425, 4311, 994 S.W.2d 481 (1999); accord Swanberg v. Tart,300 Ark. 304, 778 S.W.2d 931
(1989). I have addressed the scope of this prescription in the attached Ark. Op. Att'y Gen. No. 2000-117, in which I offered the following analysis:
 [I]n Swanberg, the Court approved legislation that conditioned a law approving Sunday racing in Hot Springs upon the voters' approval. 300 Ark. at 311. The Court explained its approval by referring to the much earlier case of Capps v. Judsonia Steprock Road Improvement District, 154 Ark. 46, 242 S.W. 72 (1922):
 In Capps, the court espoused the rule that the General Assembly may make a law to delegate the power to determine some facts or state of things, upon which the law makes or intends to make its own action depend. The court amplified by stating the following:
 . . . it is plain that the statute does not amount to a delegation of the legislative power, but on the other hand the Legislature exercised its power by declaring what the law shall be when put into operation in a given locality by ascertainment of certain facts, i.e., the will of the majority in the given locality to be affected.
 This formulation is echoed in Terrell v. Loomis, 218 Ark. 296, 299-300, 235 S.W.2d 961 (1951):
 Appellant argues that 93 is unconstitutional as an unlawful delegation of legislative authority to the Commissioner of Revenues. The applicable rule is stated in State v. Davis, 178 Ark. 153, 10 S.W.2d 513, as follows: "While it is a doctrine of universal application that the functions of the Legislature must be exercised by it alone, and cannot be delegated, it is equally well settled that the Legislature may delegate to executive officers the power to determine certain facts, or the happening of a certain contingency, on which the operation of the statute is by its terms made to depend. 12 C.J. 846, and 6 R.C.L., paragraph 165, p. 164. This principle has been frequently recognized by this court. Harrington v. White, 131 Ark. 291, 199 S.W. 92; Howard v. State, 154 Ark. 430, 242 S.W. 818; and Summers v. Road Improvement District No. 16, 160 Ark. 371, 254 S.W. 696." See, also, Wiseman v. Phillips, 191 Ark. 63, 84 S.W.2d 91; 11 Am.Jur., Constitutional Law, 216; 16 C.J.S. Constitutional Law, 138(a); Cooley's Constitutional Limitations (8th Ed.) p. 227.
 These formulations illustrate that the contingency upon which the General Assembly can condition a law is some yet to be determined but existing state of facts, such as the will of the electorate, not a future exercise of discretion by some entity other than the legislature itself.
In my opinion, given this principle, it would be constitutionally problematic for the legislature to declare that an executive board has the discretion to set drug prices based upon future events beyond the control of the legislature itself — namely, decisions made by the Canadian, Mexican or U.S. government. Insofar as the setting of prices would turn on something other than an existing state of facts, it would appear that this law would delegate to the board an exclusively legislative function. Moreover, to the extent that the proposed law would mandate that prescription drug prices track one of the indices recited in your request, the impermissible delegation would appear to be not to the board, but rather to a foreign or another legislative branch of government. I believe such legislation would be constitutionally suspect for the reasons stated in Ark. Op. Att'y Gen. No. 2000-117, in which I opined that the legislature could not prospectively dictate that tax rates would fluctuate in accordance with changes in the rate of federal taxation.
In addition, I believe a finder of fact might conclude that your proposed legislation runs afoul of U.S. Const. art. I, § 8, cl. 3, which provides in pertinent part: "Congress shall have the power . . . to regulate commerce with foreign nations, and among the several states. . . ." The standard for testing constitutionality under the commerce clause is summarized in Cotto Waxo Co. v. Williams, 46 F.3d 790, 793 (8th Cir. 1995):
 Under the Commerce Clause, a state regulation is per se invalid when it has an "extraterritorial reach," that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state. See Healy v. Beer Inst., 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989). The Commerce Clause precludes application of a state statute to commerce that takes place wholly outside of the state's borders. Id.
 If a statute is not per se invalid, then a reviewing court must determine which level of scrutiny applies. If the challenged statute discriminates against interstate transactions "either on its face or in practical effect," it burdens interstate commerce directly and is subject to strict scrutiny. See Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). A statute enacted for a discriminatory purpose is likewise subject to strict scrutiny. See Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270, 104 S.Ct. 3049, 3054-55, 82 L.Ed.2d 200 (1984). Under strict scrutiny, a state statute violates the Commerce Clause unless the state can show that the statute serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means. See Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).
 In contrast, if the challenged statute regulates evenhandedly, then it burdens interstate commerce indirectly and is subject to a balancing test. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under the balancing test, a state statute violates the Commerce Clause only if the burdens it imposes on interstate commerce are "clearly excessive in relation to the putative local benefits." Id.
(Footnotes omitted.)
Your request implicates the commerce clause primarily in that regulating in-state drug prices will inevitably have an extra-territorial effect, influencing the prices that drug manufacturers will charge out-of-state distributors that supply Arkansas drug retailers. In Healy v. The BeerInstitute, 491 U.S. 324, 336-37 (1989), the United States Supreme Court summarized as follows the law regarding such extra-territorial consequences:
 Taken together, our cases concerning the extra-territorial effects of state economic regulation stand at a minimum for the following propositions: First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," Edgar v. MITE Corp., 457 U.S. 624, 642-643 (1982) (plurality opinion); see also Brown-Forman [Distillers Corp. v. New York State Liquor Authority], 476 U.S.[573 (1986)], at 581-583; and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states," [Baldwin v. G.A.F.] Seelig, [Inc.] 294 U.S. [511 (1935)], at 528. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Brown-Forman, 476 U.S., at 579. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. Cf. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88-89 (1987). And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another. Brown-Forman, 476 U.S., at 582.
(Footnotes omitted.)
The question is whether these principles render a regulation unconstitutional merely because it has economic consequences for out-of-state manufacturers with respect to transactions conducted outside the regulating state. Instinctively, I want to answer this question in the negative, given that permissible tax and police-power regulations frequently, if not inevitably, have extra-territorial repercussions. This conclusion would be consistent with the following formulation from Cotto:
 Negatively affecting interstate commerce is not the same as discriminating against interstate commerce. In a Commerce Clause context, "discrimination" means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.
46 F.3d at 794. However, in Healy, which reviewed the constitutionality of various "affirmation statutes" — i.e., statutes that oblige merchants to affirm that for a specified period of time they will not exceed out-of-state retail liquor prices — the Supreme Court appears to have significantly qualified this conclusion. In the course of its analysis, the Court reviewed and effectively overruled its previous decision inJoseph E. Seagram Sons, Inc. v. Hostetter, 384 U.S. 35 (1966), which had upheld a law requiring distillers, wholesalers and importers of distilled spirits to affirm on a monthly basis that they would not charge a higher price for liquor sold in New York than the lowest price charged anywhere else in the United States in the preceding month:
 In the interest of removing any lingering uncertainty about the constitutional validity of affirmation statutes and of avoiding further litigation on the subject of liquor-price affirmation, we recognize today what was all but determined in Brown-Forman: to the extent that Seagram holds that retrospective affirmation statutes do not facially violate the Commerce Clause, it is no longer good law. Retrospective affirmation statutes, like other affirmation statutes, have the inherent practical extraterritorial effect of regulating liquor prices in other States. By tying maximum future prices in one State to the lowest prices in other States as determined at a specified time in the past, retrospective affirmation laws control pricing decisions in nonaffirmation States by requiring that those decisions reflect not only local market conditions, but also market conditions in the affirmation States — market conditions that would be irrelevant absent the binding force of the affirmation statutes. Every pricing decision made in a nonaffirmation State will reflect the certain knowledge that the price chosen will become in the future the maximum permissible price in the States requiring affirmation. For the reasons noted today and in Brown-Forman, this extraterritorial effect violates the Commerce Clause.
(Footnote omitted.) The principle underlying this pronouncement appears to be as straightforward as it is sweeping: if pricing decisions in one state are influenced by pricing restrictions in another state, those restrictions offend the commerce clause. As a practical matter, this principle should apply to the regulation of drug prices as well as to the regulation of liquor prices. Assuming, for instance, that the Arkansas legislature capped prices at Canadian levels, the very act of doing so would almost certainly influence drug manufacturers to increase prices in Canada and, for that matter, other states — an effect that would only be compounded if other states imposed similar caps. Healy verges on declaring that any such effect would render the Arkansas legislation perse unconstitutional. I confess to finding this conclusion very hard to reconcile with the following from Seagram: "`The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids.'" 384 U.S. at 43 (quoting Osborn v. Ozlin,310 U.S. 53, 62 (1940)). Nevertheless, Healy appears to allow of no other conclusion.
The situation described in your request is in many respects similar to one recently addressed by a federal district court in Maine. InPharmaceutical Research and Manufacturers of America v. Concannon,Commissioner, Maine Department of Human Services, Civ. No. 00-157-B-H (D. Maine 2000), an association of drug manufacturers obtained a preliminary injunction forbidding the state of Maine to enforce legislation that would have required any out-of-state drug manufacturer to provide a rebate every time an uninsured Maine resident bought the manufacturer's drugs at an in-state pharmacy.[1] In concluding that this legislation violated the commerce clause, the court offered the following analysis:
 It is undisputable that the practical effect of what Maine has done here is to limit the revenue an out-of-state manufacturer can obtain when it sells drugs to out-of-state distributors that ultimately send or bring the drugs to Maine. Under the Maine rebate program, whatever price the manufacturer originally received for that out-of-state transaction is automatically reduced when the drug comes to Maine. Because Maine has no power thus to extend its power extra-territorially and to impose this burden on interstate commerce, it is irrelevant whether its program actually discriminates against out-of-staters. Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579 (1986) (stating that state statutes are struck down if they favor in-state economic interests over out-of-state, or if they discriminate against interstate commerce or if they simply regulate interstate commerce directly, whether or not they discriminate). Accord Edgar v. MITE Corp., 457 U.S. 624, 644 ("Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law.["]); Laurence H. Tribe, American Constitutional Law § 6-8 (3d ed. 2000).
Although the legislation described in your request would not impose on out-of-state manufacturers any affirmative obligation to take action in Arkansas — a fact that distinguishes the proposed legislation from the Maine statute — it might nevertheless be deemed to burden interstate commerce in a fashion similar to Maine's law insofar as the Arkansas restriction will necessarily result in a downward adjustment of the amount out-of-state manufacturers can charge distributors who supply Arkansas pharmacists. In the wake of Healy, a court might attach no significance to the fact that in-state manufacturers, if any, would be similarly disadvantaged by the regulation.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
Enclosure
[1] This case is currently on appeal to the First Circuit Court of Appeals as Case No. 00-2446. The challenged Maine statute is in many respects similar to proposed legislation currently before the General Assembly as H.B. 1925 and H.B. 2482, both of which contemplate similar programs of manufacturer rebates.