VALLEY BANK OF
NEVADA, Plaintiff,

v.

PLUS SYSTEM, INC. and VISA U.S.A.
Inc., Defendants.

No. CV–S–89–171–PMP (RJJ).

United States District Court,
D. Nevada.

Sept. 15, 1989.

Joseph Roger Williams, Jr., Williams & Connolly, Washington, D.C., Gary R. Goodheart, Jones, Jones, Close & Brown, Las Vegas, Nev., for plaintiff.

Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Paul R. Hejmanowski, Lionel, Sawyer & Collins, Las Vegas, Nev., for defendants.

## ORDER

PRO, District Judge.

This matter is before the Court to consider cross-motions for summary judgment as to Count III of Plaintiff's Amended Complaint filed August 1, 1989.

## FACTS

Plaintiff Valley Bank of Nevada ("Valley Bank") is a Nevada banking corporation which provides numerous financial services, including the use of automated teller machines ("ATMs") located at various Valley Bank branch offices and other locations throughout the State of Nevada.

Defendant Plus System, Inc. ("Plus System") is a membership corporation organized under the laws of Delaware, with its principal place of business in Denver, Colorado. The members of Plus System consist of approximately 3,000 financial institutions, as well as one "special member," Defendant VISA USA, Inc. ("VISA"). Plus System is in the business of managing and operating a shared ATM network whereby the financial institutions that belong to Plus System agree to allow consumers to use each other's ATMs to gain access to their accounts. By processing ATM transactions between the member banks, Plus System gives banking customers access to their bank accounts at ATMs located in 48 states, a service which doubtless could not be provided by any of Plus System's member banks individually.

Shared ATM networks, such as that operated by Plus System, are increasingly widespread intrastate, regionally and nationally. They combine the resources of several proprietary ATM networks under a single trademark and offer consumers the convenience of access to their depository accounts or credit lines while traveling away from their home state, whose boundaries typically circumscribe the geographical reach of a proprietary ATM network. Member banks of the Plus System ATM network are permitted to issue ATM cards bearing the Plus System trademark to their customers, to display the Plus System trademark on their ATMs, and to connect the member bank's computer system and ATMs to the Plus System computer network in Denver, Colorado. In return, the member bank agrees to operate in accordance with the rules and regulations of the Plus System network which create a uniform set of procedures for transmitting demands for ATM withdrawals and deposits between banks and for tallying and settling up the daily flow of funds between the member banks.

Among the Plus System operating regulations is a rule which provides that no transaction fee or surcharge is to be added to the amount of the ATM transaction by a member bank when one of its ATMs is being used by a customer whose account is maintained at a "foreign" bank.[1] Plus System maintains that the purpose of this no surcharge rule is to ensure that member banks, as acquirers, do not impose additional charges at foreign ATMs, thereby preserving each card-issuing bank's exclusive control over the relationship with its own customers. By limiting the charges associated with using Plus System's ATMs to the fee, if any, charged by the issuing bank, Plus System contends that bank customers will not be confused, upset or surprised by unanticipated or varying costs resulting

---

**1.** In banking parlance, a foreign bank is any bank other than the bank at which the transaction is occurring whether within the same state or not.

from transactions conducted at another bank on the Plus System network.

Since October 1988, Valley Bank has levied a fee for the use of its off-premises casino and airport ATMs for "foreign transactions."[2] However, because of Plus System's rule prohibiting such fees, Valley Bank has levied that charge on cardholders from all of the shared ATM networks to which it belongs, both in-State and out-of-State, except the Plus System network. To implement the transaction fee, Valley Bank expanded the sequence of screens that prompts the banking customer through the ATM transaction to disclose the existence, source and amount of the transaction fee, and to provide an opportunity for a no-cost exit from the transaction by the customer.

In September 1988, Valley Bank proposed to the Plus System Board of Directors that the Plus System no-surcharge rule be modified to permit Plus System member banks to impose at least a one dollar surcharge on cash withdrawals completed at Valley Bank's off-branch premises ATMs made by foreign bank customers.[3]

At its Board meeting on January 22, 1989, the Plus System Board rejected Valley Bank's proposal to repeal the no-surcharge rule in favor of further study to assess the long-term implications of the proposal on the Plus System network and its member banks.

On March 3, 1989, Valley Bank commenced this action against Plus System and VISA alleging that Plus System's no-surcharge rule constitutes illegal price fixing and an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Valley Bank also strongly supported Senate Bill 404 in the Nevada Legislature which amended Chapter 660 of the Nevada Revised Statutes to authorize Nevada banking institutions that deploy ATMs to charge for the use of their terminals by consumers who have their accounts at oth-

er banks. SB404 also details consumer disclosure requirements that must be met if such fees are to be charged and further provides that ATM sharing agreements, such as that operated by Plus System, may not prohibit, limit or restrict a participating financial institution's right to levy any charges authorized by law or the statute's disclosure requirements.

On June 16, 1989, SB404 was enacted by the Nevada Legislature and signed into law. Following the passage of SB404, Valley Bank notified Plus System of its intention to begin charging Plus System ATM cardholders the same fees as ATM cardholders from other ATM networks were paying. Plus System objected on the ground that SB404 violated the Commerce Clause of the United States Constitution. In response Valley Bank amended its Complaint on July 31, 1989, to include, as Count III, a claim for declaratory judgment of the effect of Chapter 660 of the Nevada Revised Statutes, as amended by SB404, on the Plus System agreement.

Specifically, Valley Bank seeks a declaration that:

(a) Valley's imposition of a surcharge on PLUS transactions in conformance with Chapter 660 of the Nevada Revised Statutes, as amended by SB 404, would be and is in full accordance with the PLUS Agreement, and

(b) Chapter 660 of the Nevada Revised Statutes, as recently amended by SB 404, renders contrary to state law and void in Nevada any provision of the PLUS agreement that purports to prohibit, limit or restrict its imposition of surcharges. (See Paragraph 57 of Plaintiff's Amended Complaint.)

On August 1 and August 10, 1989, Plus System and Valley Bank filed Cross–Motions for Summary Judgment as to Count III of Valley Bank's Amended Complaint (# 63 and #68, respectively).

---

**2.** Transactions initiated by consumers whose ATM cards were issued by other banks.

**3.** The record is not clear as to precisely where each of the Valley Bank non-bank branch ATMs

are located, but it appears that the majority are located at Nevada gaming casinos, airports and shopping malls and at least one at Hoover Dam.

## ARGUMENTS OF THE PARTIES

Plus System contends that the amendment to NRS Chapter 660 contained in SB404 which precludes Plus System from enforcing its "no-surcharge" rule, violates the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3, by directly regulating the charges payable by and among member banks throughout shared ATM networks and by discriminating against interstate commerce.

Plus System argues that the predominant purpose of shared ATM networks such as that operated by Plus System is to serve the traveling public and that each shared ATM network transaction involves two separate banks: the ATM card-issuing bank and the acquiring "or ATM-owning" bank, which necessitates an agreement between bank member participants as to how they will allocate the risks and benefits of the system. Plus System maintains that "it simply is untenable to attempt to make a particular subgroup of members (here Nevada banks) subject to different rules by virtue of one state's legislative fiat."

Plus System contends that SB404 purports to regulate an important aspect of the economic interrelationship between Plus System members throughout the country by establishing the special pricing rule for transactions in Nevada. According to Plus System, this is precisely the type of direct regulation of interstate commerce prohibited by the Commerce Clause.

Plus System further argues that the Nevada law alters the primary relationship between an ATM cardholder and his or her ATM card-issuing bank by permitting independent pricing for ATM use at a foreign bank. Additionally, Plus System contends that the imposition of surcharges permitted by SB404 will alter the value of ATM services for the consumer by random and unpredictable ATM transaction pricing, which will likely result in consumer confusion.

Plus System also contends that SB404 raises the threat of inconsistent regulation in other states which the Commerce Clause is designed to protect against. Specifically, Plus System maintains that in response to the Nevada law, other states may pass legislation expressly forbidding surcharges or alternatively may pass law precluding their banks from issuing ATM cards for use in any network which permits the imposition of surcharges. According to Plus System, ". . . the single state must not be permitted to interfere with Plus' national pricing scheme."

Plus System also argues that the Nevada law discriminates against interstate commerce in that the ATM transaction surcharge is applied by Valley only on ATM cardholders from foreign banks. Thus, argues Plus System, ". . . it is only the overwhelming proportion of non-Nevada residents who frequent the state's casinos who, in fact, will be surcharged." Further, Plus System argues that the Nevada law seeks to garner for its local banking industry a larger share of the economic benefits of participating in interstate shared ATM networks, thereby discriminating against out-of-state interests.

Finally, Plus System contends that SB404 fosters improper economic "protectionism" designed to benefit Nevada economic interests by burdening out-of-state competitors.

Valley Bank responds that SB404 is not a protectionist measure which on its face discriminates against out-of-state interest in favor of in-state interests, or that has the effect of favoring Nevada banks over out-of-state competition in violation of the Commerce Clause. Indeed, argues Valley Bank, SB404 draws no distinction between intrastate and interstate ATM-sharing agreements and is therefore, facially neutral both with respect to its effect on members of the shared ATM networks and consumers. .

Valley Bank further argues that SB404 serves a variety of legitimate state objectives including the following:

(a) assuring that the benefits of free competition are realized in the provision of ATM service in Nevada;

(b) making certain that consumers are adequately informed about fees for ATM use;

(c) increasing the deployment and convenience of ATMs in Nevada; and

(d) enhancing the provision of ATM services to serve the tourist trade that is so important to Nevada's economy.

Valley Bank contends that the promotion of the foregoing state objectives far outweighs any burden placed on interstate commerce by SB404.

Valley Bank observes that banks, including nationally chartered banks, are routinely left to the dictates of state law with respect to branching and ATM deployment. Valley Bank cites numerous instances in which states have regulated where branches and ATMs may be located, what types of signs they may display, what security requirements must be satisfied, and how account information is to be handled. Valley Bank further notes that a number of states have expressly set forth the terms and conditions under which ATMs may be shared.[4] Therefore, argues Valley Bank, there is nothing novel about Nevada's enactment of SB404, and the incidental burden on interstate commerce which results is not "clearly excessive."

Finally, Valley Bank challenges as speculative Plus System's claim that SB404 poses a danger that interstate commerce will be adversely affected by inconsistent state regulation noting that there are no current state regulations which are inconsistent with SB404.

On September 5, 1989, the Brief of the Attorney General for the State of Nevada as Amicus Curiae in Opposition to Plus System's Motion for Summary Judgment and In Support of the Constitutionality of Nevada Senate Bill 404 (# 78) was filed. In addition to supporting the arguments advanced by Valley Bank in its Cross–Motion for Summary Judgment and Opposition to Plus System's Motion for Summary Judgment, the Attorney General of Nevada takes the position that if the Court were to strike down SB404 as violating the Commerce Clause, it would have adverse implications for a myriad of state laws and regulations nationwide, in such areas as insurance, transportation, environmental regulation, commercial and corporate law, as well as banking.

## STANDARD FOR GRANT OF SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–1356, 89 L.Ed.2d 538 (1986); *Cal. Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. den.*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v.*

---

**4.** See pages 20–22 of Plaintiff Valley Bank's Memorandum of Points and Authorities in Opposition to Plus System, Inc.'s Motion for Summary Judgment, filed August 10, 1989 (# 69), and footnotes 16–26.

*Hugh Johnson & Co.*, 677 F.2d 1301, 1305–06 (9th Cir.1982); *Admiralty Fund v. Jones,* 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor,* 677 F.2d 1297, 1298 (9th Cir.1982).

This Court is cognizant that the recent trilogy of Supreme Court cases establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1); *see also Avia Group Intern., Inc. v. L.A. Gear California,* 853 F.2d 1557, 1560 (Fed.Cir. 1988).

## DISCUSSION

The principals which guide the assessment of whether SB404 violates the Commerce Clause were made clear in *Brown–Forman Distillers v. N.Y. Liquor Authority,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–2084, 90 L.Ed.2d 552 (1986), where the Supreme Court specified that it had adopted a two-tier approach in analyzing state economic regulation under the Commerce Clause:

When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. *See, e.g., Philadelphia v. New Jersey,* 437 U.S. 617 [98 S.Ct. 2531, 57 L.Ed.2d 475] (1978); *Shafer v. Farmers Grain Co.,* 268 U.S. 189 [45 S.Ct. 481, 69 L.Ed. 909] (1925); *Edgar v. MITE Corp.,* 457 U.S. 624, 640–643 [102 S.Ct. 2629, 2639–2641, 73 L.Ed.2d 269] (1982) (plurality opinion). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970). We have also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity. *See Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440–441 [98 S.Ct. 787, 793–794, 54 L.Ed.2d 664] (1978).

More recently, in *Healy v. Beer Institute, Inc.,* 491 U.S. 324, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989), the Supreme Court stated that its cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions:

First, the "Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Edgar v. MITE Corp.,* 457 U.S. 624, 642–643, 102 S.Ct. 2629, 2640–2641, 73 L.Ed.2d 269 (1982) (plurality opinion); see also *Brown–Forman,* 476 U.S., at 581–583, 106 S.Ct., at 2085–2087; and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states." [*Baldwin v. GAF*] *Seelig* [, *Inc.*], 294 U.S., [511], 528, 55 S.Ct., [497], 502 [79 L.Ed. 1032 (1935)]. Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of

the regulation is to control conduct beyond the boundaries of the State. *Brown–Forman,* 476 U.S., at 579, 106 S.Ct., at 2084. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. *Cf. CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 88–89, 107 S.Ct. 1637, 1649–1650, 95 L.Ed.2d 67 (1987). And, specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another. *Brown–Forman,* 476 U.S., at 582, 106 S.Ct., at 2086 (footnotes omitted).

Applying the principals stated above, the Court finds that SB404's amendment to NRS Chapter 660 does not directly regulate or discriminate against interstate commerce. *Brown–Forman,* 476 U.S., at 578–79, 106 S.Ct., at 2083–2084. Neither does SB404 have the practical effect of controlling conduct beyond the boundaries of the State of Nevada, nor is it inconsistent with other state regulatory schemes pertaining to ATM shared networks. *Healy,* 109 S.Ct., at 2499.

SB404 applies evenhandedly to intrastate and interstate ATM shared networks and so too does the surcharge imposed by Valley Bank on "foreign" ATM transactions, whether they are intrastate or interstate. *Northwest Central Pipeline Corporation v. State Corporation Commission of Kansas,* 489 U.S. 493, 109 S.Ct. 1262, 1280–82, 103 L.Ed.2d 509 (1989). The fact that Valley Bank imposes the surcharge only on foreign ATM transactions conducted at off-bank premises ATM locations, does not alter the impact as the surcharge at such ATM locations applies equally to foreign ATM transactions involving Nevada residents and non-Nevada residents. Additionally, although legislative proceedings cited by Plus System suggest certain Nevada Legislators were preoccupied with whether or to what extent the ATM surcharge would apply to Nevada residents, the record before the Court simply does not support Plus System's claims that "it is only the overwhelming proportion of non-Nevada residents who frequent the State's casinos who, in fact, will be surcharged."

The Court finds other arguments raised by Plus System regarding the impact of SB404 on interstate commerce to be without merit. Plus System's claim of potential consumer confusion occasioned by the Valley Bank surcharge must be rejected as unfounded given the detailed disclosure to consumers provided for by SB404. Similarly, Plus System's contention that SB404 raises the threat of inconsistent regulation in other states is rejected by the panoply of state regulations cited by Valley Bank which are consistent with SB404, as well as the absence of state regulations which are not.

Finally, the Court finds that SB404 regulates evenhandedly to effectuate the legitimate state interests cited by Valley Bank and by the Attorney General for the State of Nevada in the Amicus Brief. Moreover, SB404's effects on interstate commerce are incidental at best and are clearly not excessive in relation to the state's interests advanced. *Pike v. Bruce Church,* 397 U.S. at 142, 90 S.Ct. at 847.

IT IS THEREFORE ORDERED that Defendant Plus System's Motion for Summary Judgment as to Count III of Plaintiff Valley Bank's Amended Complaint (# 65) is denied.

IT IS FURTHER ORDERED that Plaintiff Valley Bank's Cross–Motion for Summary Judgment as to Count III of its Amended Complaint (# 68) is granted.

IT IS FURTHER ORDERED that the Clerk of Court shall forthwith enter Judgment in favor of Plaintiff Valley Bank of Nevada and against Defendant Plus Sys-

tem, Inc., as to Count III of the Plaintiff's Amended Complaint (# 80).